**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Devin Justine Takeguma, et al.,

            Plaintiffs,

v.

Freedom of Expression LLC, et al.,

            Defendants.

No. CV-18-02552-PHX-MTL

**ORDER**

Before the Court are the parties' *Daubert* motions to exclude certain expert witnesses (Docs. 37, 45–46) and cross-motions for summary judgment (Docs. 39–40). The Court rules as follows.[1]

## I.    BACKGROUND

Defendant Freedom of Expression, LLC operates Bones Cabaret, a strip club in Scottsdale, Arizona. (Doc. 1–3 ("Compl.") ¶¶ 20–21.) Plaintiffs Devin Justine Takeguma, Heather Rae Young, Jessica Killings, Lucy Pinder, Rosie Jones, and Vivian Kindle are models. (*Id.* ¶ 1.) Between May 2016 and March 2017, Freedom of Expression used images of Plaintiffs in advertisements posted online via Bones Cabaret's social media. (*Id.* ¶¶ 39–44.) No Plaintiff has been employed by or has otherwise given permission to Freedom of Expression to use her image to advertise, promote, market, or endorse Bones Cabaret. (Doc. 39 at 3.) Plaintiffs allege that, by using their images without consent, Freedom of Expression "deprived [them] of the opportunity to engage in arms-length negotiations

---

[1] The Court finds the pending motions appropriate to resolve without oral argument. *See* LRCiv 7.2(f).

regarding the terms and conditions of use of their images." (Compl. ¶ 10.)

Plaintiffs initiated this lawsuit on May 1, 2018. (*Id.*) They assert three claims against Freedom of Expression: (1) Misappropriation of Likeness; (2) Violations of the Lanham Act, 15 U.S.C. § 1125(a); and (3) False Light Invasion of Privacy. (*Id.*) The parties have each retained expert witnesses. Plaintiffs hired an expert to conduct a survey to explore the potential consumer confusion that resulted from Freedom of Expression's use of Plaintiffs' images. Both parties retained an expert to testify as to the value of Plaintiffs' damages. The parties now move to strike one another's experts. (Docs. 37, 45–46.) The parties also move for summary judgment on all claims. (Docs. 39–40.)

## II.    LEGAL STANDARDS

### A.    *Daubert* Standard

A party seeking to offer expert testimony must establish that the testimony satisfies Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As a gatekeeper, trial judges make a preliminary assessment as to whether expert testimony is admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141–42 (1999). Specifically, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. To meet the

1  requirements of Rule 702, an expert must be qualified, the expert's opinion must be reliable
2  in that it is based on sufficient facts or data and is the product of reliable principles and
3  methods, and the expert's testimony must fit the case such that the expert's opinion is
4  relevant. *Id.* 589–95. The Rule 702 inquiry is "flexible." *Id.* at 594. The focus "must be
5  solely on principles and methodology, not on the conclusions that they generate." *Id.* at
6  595. The requirements of Rule 702 are conditions for determining whether expert
7  testimony is admissible. *Id.* at 592 n.10. Thus, a party offering expert testimony must show
8  by a preponderance of the evidence that the expert's testimony satisfies Rule 702. *See* Fed.
9  R. Evid. 104(a); *Lust v. Merrell Dow Pharms. Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

10  ### B.    Summary Judgment Standard

11  Summary judgment is appropriate if the evidence, viewed in the light most favorable
12  to the nonmoving party, demonstrates "that there is no genuine dispute as to any material
13  fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A
14  genuine issue of material fact exists if "the evidence is such that a reasonable jury could
15  return a verdict for the nonmoving party," and material facts are those "that might affect
16  the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477
17  U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant
18  is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255;
19  *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) ("The
20  court must not weigh the evidence or determine the truth of the matters asserted but only
21  determine whether there is a genuine issue for trial.").

22  "[A] party seeking summary judgment always bears the initial responsibility of
23  informing the district court of the basis for its motion, and identifying those portions of
24  [the record] which it believes demonstrate the absence of a genuine issue of material fact."
25  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment
26  must "cit[e] to particular parts of materials in the record" establishing a genuine dispute or
27  "show[] that the materials cited do not establish the absence of . . . a genuine dispute." Fed.
28  R. Civ. P. 56(c)(1). This Court has no independent duty "to scour the record in search of a

1    genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal

2    quotations omitted).

3          Where, as here, "parties submit cross-motions for summary judgment, each motion

4    must be considered on its own merits." *Fair Hous. Council of Riverside Cnty. v. Riverside*

5    *Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations and internal quotations omitted). The

6    summary judgment standard operates differently depending on whether the moving party

7    has the burden of proof. *See Celotex Corp.*, 477 U.S. at 322–23. As the party with the

8    burden of proof, a plaintiff "must establish beyond controversy every essential element" of

9    her claims based on the undisputed facts. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d

10   885, 888 (9th Cir. 2003) (internal quotations omitted). A defendant, by contrast, is entitled

11   to summary judgment where it shows that a plaintiff cannot establish at least one element

12   of her claim considering the undisputed material facts. *Celotex Corp.*, 447 U.S. at 322–23.

13   **III.   DISCUSSION**

14       **A.   *Daubert* Motions**

15         Plaintiffs and Freedom of Expression retained respective experts. Plaintiffs hired

16   Martin Buncher to conduct a survey to measure the likelihood of consumer confusion that

17   resulted from Freedom of Expression's use of Plaintiffs' images. (Doc. 46–5 at 5.) In

18   addition, Plaintiffs retained Stephen Chamberlin to "evaluate and value retroactively the

19   compensation [Plaintiffs] would and should have received for the use of their respective

20   images by Freedom of Expression." (Doc. 45–5 at 5.) Freedom of Expression hired

21   Dr. Michael Einhorn to respond to Mr. Chamberlin's report and "provide an alternative

22   benchmark valuation for compensating each [Plaintiff]." (Doc. 42–4 at 4, 61.)

23        Both parties have moved to strike the other's experts.[2] (Docs. 37, 45–46.) Because

---

24   [2] Plaintiffs argue Freedom of Expression's *Daubert* motions are untimely. (Doc. 48 at 1–

25   2; Doc. 50 at 2–3.) The Scheduling Order governing this case set the dispositive motion
deadline for March 20, 2020. (Doc. 15 at 5.) This Court extended the dispositive motion

26   deadline to May 19, 2020, pursuant to a stipulation by the parties. (Doc. 33.) A *Daubert*
motion is not a dispositive motion. Neither the Scheduling Order nor this Court's

27   subsequent Order extending case management deadlines set a non-dispositive motion or
*Daubert* motion deadline. As Plaintiffs correctly note, this Court generally sets the deadline
for any motions challenging expert opinion testimony at the same time as the dispositive

28   motion deadline. (Doc. 48 at 2.) But that is not the case here. Plaintiffs had ample time to
oppose and argue the merits of Defendant's *Daubert* motions. Thus, the Court, in its

the experts' testimony is material to the Court's evaluation of the parties' summary judgment motions, the Court will first address the parties' *Daubert* motions.

### 1.    Martin Buncher

Freedom of Expression challenges the reliability and relevance of Mr. Buncher's survey and corresponding report. (Doc. 46 at 2.) As noted, Plaintiffs retained Mr. Buncher to conduct a survey "to explore possible confusion among consumers exposed to" Freedom of Expression's use of Plaintiffs' images. (Doc. 46–5 at 5.)

### a.    Reliability

When a survey is conducted according to accepted principles, survey evidence is sufficiently reliable under *Daubert*. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997); *see also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010). Objections concerning "technical inadequacies" of a survey, "including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988); *see also Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001) ("[I]ssues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility.").

Mr. Buncher has 54 years of experience conducting market research and providing marketing consulting services. (Doc. 46–5 at 6.) His report states that "[t]he survey sample selection, questions, questionnaire design, and interviewing procedures employed in [his] survey were specifically designed in accordance with the generally accepted standards and procedures in the fielding of surveys set forth by the American Marking Association" and other organizations. (*Id.* at 7.) Mr. Buncher's report explains his methodology and how his methodology conforms with those generally accepted principles. (*Id.* at 7–26.) Freedom of Expression challenges the reliability of Mr. Buncher's survey on multiple grounds.

---

discretion, will address the merits of Freedom of Expression's *Daubert* motions.

1

###### i.     Control Group and Control Question

2        Freedom of Expression first argues Mr. Buncher's survey is unreliable because he

3 did not use a control group or an adequate "control question." (Doc. 46 at 8–11.) Freedom

4 of Expression cites no Ninth Circuit authority to support its position. Rather, Freedom of

5 Expression relies on an Order from the Southern District of New York, in which the court

6 struck Mr. Buncher's survey in a similar case. (*Id.* at 8.); *see Edmondson v. RCI Hosp.*

7 *Holdings, Inc.*, No. 16-CV-2242 (VEC), 2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020).

8 Under Ninth Circuit law, technical inadequacies—like the lack of a control group—go to

9 the weight of the survey evidence, not admissibility. *Keith*, 858 F.2d at 480; *see Mattel,*

10 *Inc. v. MCA Recs., Inc.*, 28 F. Supp. 2d 1120, 1135 (C.D. Cal. 1998) (finding a survey's

11 lack of a control group was a technical unreliability that went to the weight of the survey).

12 And courts within the District of Arizona have rejected Freedom of Expression's control-

13 group argument. *See Mitcheson v. El Antro LLC*, No. CV-19-01598-PHX-GMS, 2020

14 WL 7075239, at *4 (D. Ariz. Dec. 3, 2020); *Pinder v. 4716 Inc.*, No. CV-18-02503-RCC,

15 2020 WL 6081498, at *5 (D. Ariz. Oct. 15, 2020); *Geiger v. Creative Impact Inc.*, No. CV-

16 18-01443-PHX-JAT, 2020 WL 3268675, at *3 (D. Ariz. June 17, 2020).

17        Freedom of Expression further contends Mr. Buncher's survey makes no attempt to

18 account for potential bias. (Doc. 46 at 9–10, 14.) Specifically, Freedom of Expression

19 argues "the survey alerted respondents that the identity of the Plaintiff was the variable

20 being measured and defeated the purpose of a control question." (*Id.* at 11.) Freedom of

21 Expression's objection again goes to the weight of Mr. Buncher's testimony. *See Hadley*

22 *v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1110 (N.D. Cal. 2018) (holding a "focalism

23 bias objection goes to the weight, and not to the admissibility" of a proffered survey);

24 *Morales v. Kraft Foods Grp., Inc.*, No. LA CV14-04387 JAK, 2017 WL 2598556, at *15–

25 16 (C.D. Cal. June 9, 2017) (rejecting a defendant's argument that an expert "failed to

26 conduct a blind survey and instead telegraphed respondents the purpose of the survey"

27 because it went to the weight, not the admissibility, of the survey evidence). Thus, the

28 issues pertaining to a control group and control question are to be weighed by the factfinder,

not resolved by the Court on a *Daubert* motion.

ii.     **Flawed Questions and Improper Answers**

Freedom of Expression next takes issue with the format and wording of Mr. Buncher's survey. (Doc. 46 at 11–14.) Specifically, Freedom of Expression argues the answer choices encouraged guessing because respondents did not have the option to indicate a lack of knowledge, the survey did not verify any purported recognition of Plaintiffs, the questions included undefined and ambiguous terms, and the answer choices used phrases like "[a]ll of the women," which required respondents to give an "all or nothing" response. (*Id.*) Freedom of Expression further contends the survey's use of the word "ads" rather than "social media posts" and the survey's use of leading questions triggered biased responses. (*Id.* at 12; Doc. 56 at 6–7.)

The Court finds that Freedom of Expression's objections are without merit. As noted, technical inadequacies and "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) (finding a district court's refusal to admit survey evidence because it was "not a good survey" to be an abuse of discretion). Technical inadequacies include challenges to the clarity of survey questions, the objectivity of a survey, the format of survey questions, and perceived bias. *See Fortune Dynamic*, 618 F.3d at 1036; *Keith*, 858 F.2d at 481. Indeed, in *Prudential Insurance Co. of America v. Gibraltar Financial Corp.*, the Ninth Circuit considered and rejected a Second Circuit opinion, which excluded survey evidence because it contained self-serving questions and failed to duplicate actual marketing conditions. 694 F.2d 1150, 1156 (9th Cir. 1982) (citing *Am. Foot Wear Corp. v. Gen. Footwear Co.*, 609 F.2d 665, 660 n.4 (2d Cir. 1979)). Rather than follow the Second Circuit's approach, the Ninth Circuit determined that "admit[ting] the survey and "discount[ing] its probative value" was "the better course." *Id.* Freedom of Expression's objections to the survey's wording and concerns of bias therefore go to the weight of the survey evidence, not its admissibility. *See Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2015 WL 8479320, at *5 (E.D. Cal. Dec. 9, 2015) ("[The] wording of [survey] questions goes

1    to the weight of the evidence, and not the admissibility of the survey.").

2                       **iii.**      **Unrepresentative Sample and Prior Exposure**

3            Freedom of Expression further argues that the survey relies on an unrepresentative

4    sample. (Doc. 46 at 15; Doc. 56 at 8.) Like Freedom of Expression's other qualms with the

5    reliability of Mr. Buncher's survey, this argument also goes to the survey's weight. *E.g.*,

6    *ThermoLife Int'l, LLC v. Gaspari Nutrition, Inc.*, 648 F. App'x 609, 613 (9th Cir. 2016)

7    (concluding an unrepresentative sample does not preclude a survey's admissibility). In

8    addition, Freedom of Expression contends the survey does not account for the respondents'

9    prior exposure to the relevant advertisements. (Doc. 56 at 8.) But the crux of that contention

10   is that the survey lacked a control group, which this Court has already considered and

11   rejected as grounds for precluding Mr. Buncher's survey and report. (*Id.* ("Because there

12   was no control group and no attempt to account for prior knowledge of the Defendant's

13   club and its advertising, no conclusion can be drawn about the effect of the pictures of the

14   women in the ads shown in the Survey.").) *See supra* Part III.A.1.a.i.

15                      **iv.**      **Conclusion**

16           Freedom of Expression's objections to the reliability of Mr. Buncher's report and

17   survey go to the weight of his testimony, not its admissibility. The Court finds that

18   Mr. Buncher conducted the survey according to accepted principles, and thus his report

19   and survey are sufficiently reliable. *See Southland Sod Farms*, 108 F.3d at 1143 n.8.

20                    **b.**      **Relevance**

21           Freedom of Expression also challenges the relevance of Mr. Buncher's survey and

22   report. (Doc. 46 at 15–17.) Expert testimony is relevant if the testimony is sufficiently tied

23   to the facts of a case such that it will aid the jury in understanding evidence or resolving a

24   factual dispute. *Daubert*, 509 U.S. at 591. In this case, Plaintiffs' assert false light claims,

25   misappropriation claims, and claims under the Lanham Act. (Compl. at 14–20.) The Court

26   finds that Mr. Buncher's survey and report will assist the trier of fact in determining

27   whether Freedom of Expression's use of Plaintiffs' images deceived consumers or implied

28   that Plaintiffs promoted, endorsed, or were otherwise associated with Bones Cabaret.

1  Accordingly, the Court finds that Mr. Buncher's survey and report are relevant.

2  **c.  Conclusion**

3  The Ninth Circuit has "long held that survey evidence should be admitted as long

4  as it is conducted according to accepted principles and is relevant." *Fortune Dynamic, Inc.*,

5  618 F.3d at 1036 (internal quotations omitted). Because Mr. Buncher's survey meets both

6  requirements, the Court will deny Freedom of Expression's Motion to Strike the Report

7  and Testimony of Martin Buncher (Doc. 46).

8  **2.  Stephen Chamberlin**

9  Freedom of Expression also moves to strike the report and testimony of

10  Mr. Chamberlin. (Doc. 45.) Plaintiffs retained Mr. Chamberlin to testify as to their

11  damages. Specifically, Mr. Chamberlin retroactively valued the compensation Plaintiffs

12  "would and should have received for the use of their respective images by Freedom of

13  Expression." (Doc. 45–5 at 5.) Freedom of Expression challenges the reliability of

14  Mr. Chamberlin's opinion. (Doc. 45 at 2.)

15  Expert testimony must be "properly grounded, well-reasoned, and not speculative

16  before it can be admitted." Fed. R. Evid. 702 Advisory Committee Notes to 2000

17  Amendments. An expert's testimony "must be grounded in an accepted body of learning

18  or experience in the expert's field, and the expert must explain how the conclusion is so

19  grounded." *Id.* If an expert's experience is the predominant basis for his or her testimony,

20  "a lack of peer review, publication, and general acceptance in the field is not dispositive

21  because the expert's opinion is the result of the expert's experience, not science." *Geiger*,

22  2020 WL 3268675 at *8; *see Kumho Tire Co.*, 526 U.S. at 156 ("[N]o one denies that an

23  expert might draw a conclusion from a set of observations based on extensive and

24  specialized experience.").

25  Mr. Chamberlin has 30 years of experience as an agent in the model and talent

26  industry. (Doc. 45–5 at 4.) His report explains that a "day rate" for work by a model is the

27  basis of all negotiations in the industry. (*Id.* at 10.) Mr. Chamberlin calculated Plaintiffs'

28  day rates based on his valuation of a "hypothetical negotiat[ed]" price that Freedom of

Expression would pay each Plaintiff for the use of her image. (*Id.* at 14.) The day rate, Mr. Chamberlin asserts, "should contain a premium, or, at a minimum be equal to the value set by previous commercialization of [each Plaintiff's] image in combination with other factors that would influence . . . a day's rate." (*Id.*) Those factors include the model's desirability, the model's work history, the nature of the business seeking the model's service, and possible career damage or stigmatism attached to being portrayed with a particular business. (*Id.* at 10–11.) Mr. Chamberlin's day-rate valuations are based on his consideration of the factors listed in his report and his "experience and expertise in the [model and talent] industry." (*Id.* at 27, 38, 53, 63, 75; Doc. 45–6 at 12.) After determining Plaintiffs' day rates, Mr. Chamberlin then calculated the additional costs Freedom of Expression would have incurred based on "Usage." (Doc. 45–5 at 12.) Usage, as defined in Mr. Chamberlin's report, "includes the way and method of use and distribution of images including but not limited to advertising, social media, third party promotion, branding, [b]illboard displays, coupons, and more." (*Id.* at 7.) Mr. Chamberlin assumed each Plaintiff would receive the same day rate for each use of an image and thereby multiplied each Plaintiff's day rate by Freedom of Expression's "usages" of her image. (*E.g.*, *id.* at 28.)

Freedom of Expression challenges the reliability of Mr. Chamberlin's opinion on two grounds. First, Freedom of Expression argues Mr. Chamberlin's calculations of Plaintiffs' working day rates rely "solely on each Plaintiff's most lucrative contract." (Doc. 45 at 2.) But, as noted, Mr. Chamberlin's report explains that his day-rate calculations are based on his experience in the industry and the multiple factors listed in his report. Second, Freedom of Expression argues Mr. Chamberlin's methodology is flawed because he "multiplie[d] the day rate by arbitrary 'usage' multipliers for each singular use—rather than a single rate for the use of a photograph, as is standard in the industry." (*Id.*) That argument, which relates to Freedom of Expressions disagreement with the assumptions Mr. Chamberlin made for purposes of his calculations, goes to the weight of Mr. Chamberlin's testimony, not its admissibility. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) ("Disputes as to . . . faults in [an expert's] use of [a

1    particular] methodology . . . go to weight, not the admissibility, of his testimony."); *Dorn*

2    *v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir. 2005) ("[C]riticisms of

3    an expert's method of calculation are matters for the jury's consideration in weighing that

4    evidence.").

5          Because Mr. Chamberlin's calculations and assumptions are based on his 30 years

6    of experience in the model and talent industry, this Court finds Mr. Chamberlin's

7    methodology reliable. *See, e.g.*, *Mitcheson*, 2020 WL 7075239 at *4 (finding

8    Mr. Chamberlin's same methodology applied in a similar case to be reliable). When

9    rendering his opinion, Mr. Chamberlin applied his experience to the facts of this case. *See*

10   *Kumho Tire Co.*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion

11   from a set of observations based on extensive and specialized experience."). And

12   Mr. Chamberlin's report adequately explains the bases underlying his conclusions. *See*

13   Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments. Accordingly, the

14   Court finds Plaintiffs have met their burden of showing that Mr. Chamberlin's expert

15   testimony is reliable. Freedom of Expression's Motion to Strike the Report and Testimony

16   of Stephen Chamberlin (Doc. 45) is therefore denied.

17               **3.**     **Dr. Michael Einhorn**

18         Plaintiffs move to strike the report and testimony of Freedom of Expression's expert

19   Dr. Einhorn. Freedom of Expression retained Dr. Einhorn to testify as to the value of

20   Plaintiffs' damages. Specifically, Dr. Einhorn's opinion responds to Mr. Chamberlin's

21   report and "provide[s] an alternative benchmark valuation for compensating each

22   [Plaintiff]." (Doc. 42–4 at 4, 61.) Plaintiffs challenge Dr. Einhorn's qualifications, the

23   reliability of his opinion, and the relevance of his opinion. (Doc. 37 at 9–15.)

24               **a.**     **Qualifications**

25         Plaintiffs argue Dr. Einhorn is "ill-equipped" to render an expert opinion in this case

26   because he "has never negotiated a modeling or talent contract." (Doc. 37 at 10–11.)

27   Plaintiffs contend that Dr. Einhorn's opinion "ignored Plaintiffs' own careers, contracts,

28   experience, earnings, and renown." (*Id.* at 11.) "Such naïve and foundationless analysis,"

Plaintiffs say, "could be offered only by an individual who lacks the most fundamental comprehension of the modeling industry." (*Id.*) In response, Freedom of Expression contends that Plaintiffs' arguments "go to the weight of [Dr. Einhorn's] opinions, not the substance of his opinions nor his qualifications." (Doc. 42 at 8.) The Court agrees with Freedom of Expression.

Rule 702 requires this Court to evaluate whether a proffered witness "is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "The qualification standard is meant to be broad and to seek a 'minimal foundation' justifying the expert's role as an expert." *Allen v. Am. Cap. Ltd.*, 287 F. Supp. 3d 763, 776 (D. Ariz. 2017) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir. 2004)). A minimal foundation is established if a proffered expert has years of relevant experience. *See Hangarter*, 373 F.3d at 1015–16 (finding years of experience in a relevant industry "lays at least the *minimal foundation* of knowledge, skill, and experience required" to qualify as an expert). The Court's gatekeeping function under Rule 702 does not supplant "the traditional and appropriate means of attacking shaky but admissible evidence," like "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

Dr. Einhorn has a Ph.D. in microeconomics and 19 years of experience testifying as a valuation expert. (Doc. 42–5 at 4.) He has "provided valuation services in areas of intellectual property, media, entertainment, [and] publicity rights," including "lawsuits involving over 135 models who [] alleged right of publicity claims for unlawful use of their image." (*Id.*) Dr. Einhorn has also authored and published multiple articles on media, technology, and intellectual property. (Doc. 42–4 at 87–89.) Plaintiffs' arguments are focused on Dr. Einhorn's alleged lack of "comprehension of the modeling industry." (Doc. 37 at 11.) For example, Plaintiffs assert Dr. Einhorn is "in no position to opine why (undisclosed) modeling contracts . . . have any bearing on each Plaintiff's damages" because he has "never negotiated a modeling or talent contract in his life." (*Id.*) Plaintiffs' allegations, however, go to the weight of Dr. Einhorn's testimony, not its admissibility. *See*

*Kennedy*, 161 F.3d at 1231 ("Disputes as to the strength of an expert's credentials . . . go to the weight, not the admissibility, of his testimony."); *People v. Kinder Morgan Energy Partners*, 159 F. Supp. 3d 1182, 1190 (S.D. Cal. 2016) (concluding an expert was qualified because he had provided market analyses in a wide variety of industries even though he lacked experience in the specific field at issue).

The Court finds that Dr. Einhorn's 19 years of experience providing valuation services in areas including intellectual property lays at least the minimal foundation of knowledge, skill, and experience required under Rule 702. *See Hangarter*, 373 F.3d at 1015–16. Freedom of Expression has therefore established by a preponderance that Dr. Einhorn is qualified to offer an opinion on the value of Plaintiffs' damages. *See Mitcheson*, 2020 WL 7075239 at *2 (finding Dr. Einhorn to be sufficiently qualified in a similar case); *Geiger*, 2020 WL 3268675 at *7–8 (same).

### b. Reliability

Plaintiffs next take issue with the reliability of Dr. Einhorn's opinion. (Doc. 37 at 13–14.) Plaintiffs allege they "are in the dark concerning what contracts Einhorn relied on or what they have to do with Plaintiffs." (*Id.* at 13.) Plaintiffs challenge Dr. Einhorn's use of Google to formulate his opinion and contend his opinion is "flatly wrong and based on objectively incorrect assumptions." (*Id.* at 14.)

When expert testimony is proffered, the testimony must be "properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments. An expert's testimony "must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *Id.* If an expert's experience is the predominant basis for his or her testimony, "a lack of peer review, publication, and general acceptance in the field is not dispositive because the expert's opinion is the result of the expert's experience, not science." *Geiger*, 2020 WL 3268675 at *8; *see Kumho Tire Co.*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

1   The Court finds Dr. Einhorn's report sufficiently explains the bases underlying his

2   conclusions. Dr. Einhorn formulated his opinion using techniques of microeconomics and

3   by reviewing documents produced by Plaintiffs' during discovery, including Plaintiffs'

4   own contracts, contracts from cases similar to this matter, and a web-based search of the

5   phrase "working day rates, models," which identified websites describing different

6   categories of modeling services and corresponding rates. (Doc. 42–4 at 62–66; Doc. 42–5

7   at 6–14.) The essence of Plaintiffs' argument is that they do not agree with Dr. Einhorn's

8   methodology. For example, Plaintiffs take issue with Dr. Einhorn's use of an "image rate"

9   instead of a pre-negotiated rate. (Doc. 37 at 14.) But "criticisms of an expert's method of

10  calculation are matters for the jury's consideration in weighing that evidence." *Dorn*, 397

11  F.3d at 1196 (internal quotations omitted). Considering the bases underlying his opinion

12  and that Dr. Einhorn has almost two decades of experience in providing valuation services

13  in the fields of intellectual property, media, and entertainment, the Court finds Freedom of

14  Expression has met its burden of showing Dr. Einhorn's expert testimony is reliable.

### c.   Relevance

16  Last, Plaintiffs challenge the relevance of Dr. Einhorn's opinion. Plaintiffs argue

17  that Dr. Einhorn's opinion will not assist the trier of fact. (Doc. 37 at 14–15.) In short,

18  Plaintiffs ask: "why should the jury in this case be allowed to listen to a Ph.D. in economics

19  testify about something a layman can do *i.e.*, conduct a web search via Google[?]" (*Id.*)

20  Expert testimony is relevant if the testimony is sufficiently tied to the facts of a case

21  such that it will aid the jury in understanding evidence or resolving a factual dispute.

22  *Daubert*, 509 U.S. at 591. The Court first notes that it has already considered and rejected

23  Plaintiffs' argument that Dr. Einhorn's opinion was based solely on a web search via

24  Google. *See supra* Part III.A.3.b. Second, rather than articulating why or how

25  Dr. Einhorn's opinion is irrelevant, Plaintiffs continue to attack his methodology. (*See*

26  Doc. 37 at 15.) Regardless of whether a party is challenging the reliability or the relevance

27  of proffered expert testimony, "[d]isputes as to . . . faults in [an expert's] use of a particular

28  methodology . . . go to the weight, not the admissibility, of his testimony." *Kennedy*, 161

F.3d at 1231 (internal quotations omitted). Because Dr. Einhorn's opinion will aid the jury in determining the extent of Plaintiffs' damages, the Court finds that Freedom of Expression has met its burden of showing that Dr. Einhorn's opinion is relevant.

### d.   Conclusion

The Court finds that Dr. Einhorn is qualified to give expert testimony on the issue of Plaintiffs' damages, his methodology is sufficiently reliable, and his opinion is relevant. Plaintiffs' Motion to Strike the Expert Report and Testimony of Michael Einhorn (Doc. 37) is therefore denied.

### B.   Summary Judgment Motions

The parties have moved for summary judgment on each of Plaintiffs' claims.[3] (Docs. 39–40.) The Court will first address Plaintiffs' claims arising under Arizona law.

### 1.   Arizona Claims

### a.   Invasion of Privacy by False Light

Freedom of Expression argues Plaintiffs' false light invasion of privacy claims are barred by the statute of limitations. The Court agrees. To evaluate whether Plaintiffs' false light claims are time-barred, this Court must apply Arizona law. *Albano v. Shea Homes Ltd.*, 634 F.3d 524, 528 (9th Cir. 2011) ("[S]tatutes of limitations are substantive in nature,

---

[3] Plaintiffs request that the Court strike the Separate Statement of Facts that Freedom of Expression filed in support of its summary judgment motion. (Doc. 44 at 3 n.2.) The Scheduling Order governing this case states:

> This Court is suspending LRCiv 56.1, except subsection (d). The Court will decide summary judgment motions under Fed. R. Civ. P. 56 only. Therefore, the parties may not file separate statements of facts or controverting statements of facts. Rather the parties must include all facts in the motion, response, or reply itself.

(Doc. 15 at 5.) Notwithstanding that unequivocal language, Freedom of Expression filed a Separate Statement of Facts. (Doc. 41.) When resolving the parties' summary judgment motions, the Court did not consider any facts stated in Freedom of Expression's Separate Statement of Facts that were not also included in Freedom of Expression's motion or reply. Because Plaintiffs are not prejudiced by Freedom of Expression's unauthorized filing of a Separate Statement of Facts, the Court, in its discretion, will not strike Freedom of Expression's Separate Statement of Facts. *See Miranda v. S. Pac. Transp. Co.*, 710 F.2d 516, 521 (9th Cir. 1983) ("District courts have broad discretion in interpreting and applying their local rules."). The Court will, however, admonish Freedom of Expression and its counsel for ignoring this provision of the Scheduling Order.

and, therefore, state statutes of limitations appl[y] [to state law claims].”). The parties agree that, under Arizona law, a one-year limitations period governs claims for invasion of privacy by false light. (Doc. 40 at 19; Doc. 44 at 16.) *See Watkins v. Arpaio*, 239 Ariz. 168, 173 (App. 2016) (recognizing a one-year statute of limitations for a false light claim). Plaintiffs’ initiated this action on May 1, 2018. (Doc. 1.) Thus, any false light claim based on the use of an image published before May 1, 2017 is time barred.

The parties do not dispute the publication dates in this case. Freedom of Expression posted advertisements including Ms. Jones’s image on May 24, 2016 and March 29, 2017. (Compl. ¶ 43.) The advertisements containing Ms. Pinder’s image occurred between August 7, 2016 and October 13, 2016. (*Id.* ¶ 42.) And Freedom of Expression posted images of Ms. Takeguma, Ms. Young, Ms. Killings, and Ms. Kindle on March 29, 2017. (*Id.* ¶¶ 39–41, 44.) Because all publications in this matter occurred before May 1, 2017, Plaintiffs’ invasion of privacy by false light claims are barred by the statute of limitations.

Plaintiffs make two arguments to resurrect their time-barred claims. First, Plaintiffs contend “it is well-settled in this Circuit that ‘[w]hen a tort involves continuing wrongful conduct, the statute of limitations doesn’t begin to run until that conduct ends.” (Doc. 44 at 16 (quoting *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002)).) Plaintiffs’ argument misreads *Flowers*. Contrary to Plaintiffs’ assertion, *Flowers* does not stand for the proposition that it is “well-settled” in the Ninth Circuit that the continuing wrong doctrine applies to false light claims. Rather, in *Flowers*, the Ninth Circuit determined that the application of the continuing tort doctrine to defamation claims was inappropriate. 310 F.3d at 1126. The Ninth Circuit explained that “[t]he doctrine applies where there is no single incident that can fairly or realistically be identified as the cause of significant harm.” *Id.* (internal quotations omitted). But the defamation claim in *Flowers* arose from a book published five years before the plaintiff filed suit. *Id.* Because the “publication of the book was a single incident,” the Ninth Circuit declared that the claim accrued immediately upon the publication. *Id.* Thus, “[t]he only thing ‘continuing’ about th[e] tort was [the plaintiff’s] protracted failure to bring a lawsuit.” *Id.* Like the publication of the book in *Flowers*,

1    Plaintiffs' false light claims arise from discrete publications. *Flowers* therefore does not

2    support Plaintiffs' position.

3        Second, Plaintiffs assert that "[t]he Arizona Court of Appeals has recognized that,

4    pursuant to the continuous tort doctrine, accrual of the statute of limitations 'begins at the

5    termination of the wrongdoing, rather than at the beginning.'" (Doc. 44 at 16 (quoting *Cruz*

6    *v. City of Tucson*, 243 Ariz. 69, 74 (App. 2017)).) Like *Flowers*, *Cruz* is inapposite. In

7    *Cruz*, the Arizona Court of Appeals affirmed that the continuing wrong doctrine exists in

8    Arizona and explained that, under the doctrine, "a tort claim based on a series of related

9    wrongful acts is considered continuous" such that "accrual begins at the termination of the

10   wrongdoing, rather than the beginning." 243 Ariz. at 74. But there are no continuous acts

11   in this case. Instead, "there is one discrete posting of a Plaintiff's image per claim against

12   Defendant." *Pinder v. 4716 Inc.*, No. CV-18-02503-RCC, --- F. Supp. 3d ---, 2020 WL

13   6084052, at *4 (D. Ariz. Oct. 15, 2020). Thus, *Cruz* offers Plaintiffs no support.

14       In addition, the Arizona Court of Appeals has explicitly rejected the application of

15   the continuing wrong doctrine to false light claims. *Watkins*, 239 Ariz. at 173 ("We are

16   unaware of any authority compelling the conclusion that a false-light claim is subject to

17   the 'continuing wrong' doctrine, and we decline [the plaintiff's] request to apply it here.").

18   In *Watkins*, the Arizona Court of Appeals affirmed a lower court's entry of summary

19   judgment in a defendant's favor on statute of limitations grounds because the plaintiff "did

20   not cite any actionable statement [the defendant] made concerning him within a year of

21   filing his lawsuit." *Id.* The same is true here.

22       Considering the foregoing, the Court finds that the continuing wrong doctrine does

23   not apply to Plaintiffs' false light claims, and thus the doctrine cannot prolong the one-year

24   statute of limitations. Because Plaintiffs' claims for invasion of privacy by false light are

25   time-barred, Defendant is entitled to summary judgment.

26                       **b.    Common Law Right of Publicity**

27       Plaintiffs and Freedom of Expression both argue they are entitled to summary

28   judgment on Plaintiffs' claims for common law right of publicity. (Doc. 39 at 5; Doc. 40

1    at 7.) The Court will address the parties' arguments in turn.

2    **i.**       **Arizona Recognizes a Right of Publicity**

3    Freedom of Expression contends that Arizona does not recognize a common law

4    right of publicity. (Doc. 40 at 7.) The Court disagrees. The Arizona Court of Appeals

5    recognized a right of publicity in *In re Estate of Reynolds*, 235 Ariz. 80, 85 (App. 2014).[4]

6    Freedom of Expression attempts to sidestep *Estate of Reynolds* by arguing that the appellate

7    court's "discussion of a theoretical right of publicity is dicta." (Doc. 47 at 7.) The Arizona

8    Court of Appeals, however, specifically stated: "[We] *hold* that an individual has a right of

9    publicity that protects his or her name and/or likeness from appropriation for commercial

10   or trade purposes." *Estate of Reynolds*, 235 Ariz. at 83 (emphasis added). If that clear

11   language is not enough, the appellate court concluded that, although Arizona recognizes a

12   right of publicity and that right is descendible, the plaintiff-estate could not establish a

13   violation because the complained-of publications were "expressive works that [did] not

14   employ [the decedent's] name or likeness for purposes of trade." *Id.* at 85. Thus, contrary

15   to Freedom of Expression's assertions, the court's recognition of the right of publicity was

16   essential to its decision. The appellate court's "hold[ing] that a right of publicity exists

17   under Arizona law," is therefore not obiter dictum as Freedom of Expression suggests. *Id.*

18   at 81; *see Dictum*, Black's Law Dictionary (11th ed. 2019) (defining "obiter dictum" as

19   "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary

20   to the decision in the case and therefore not precedential").

21   Freedom of Expression next argues that, by enacting A.R.S. § 12-761, the Arizona

22   Legislature deprived all non-soldiers of the right to publicity. (Doc. 40 at 8.) That argument

23   is at odds with the statute's text. The law provides: "The right to control and to choose

24   whether and how to use a soldier's name, portrait or picture for commercial purposes is

25   recognized as each soldier's right of publicity." A.R.S. § 12-761(A). The statute further

26   _____

27   [4] The Court finds no indication that the Arizona Supreme Court would not recognize an individual right of publicity. *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990) (internal quotations and citations omitted) ("In the absence of convincing evidence that the highest

28   court of the state would decide differently, a federal court is obligated to follow the decisions of the state's intermediate courts.").

states: "The rights and remedies provided in this section *supplement* any other rights and remedies provided by law, *including the common law right of privacy*." A.R.S. § 12-761(E) (emphasis added). Arizona courts presume that statutes do no change or abrogate common law causes of action unless the Legislature clearly manifests an intent to do so. *Orca Commc'ns Unlimited, LLC v. Noder*, 236 Ariz. 180, 182 (2014). The text of A.R.S. § 12-761 suggests that the Legislature intended to preserve the common law right of privacy, not eliminate it. A.R.S. § 12-761(E). Indeed, the Arizona Court of Appeals recognized the individual right to privacy in 2014, seven years after the passage of A.R.S. § 12-761. *Estate of Reynolds*, 235 Ariz. at 83. Accordingly, the Court rejects Freedom of Expression's argument that A.R.S. § 12-761 forecloses Plaintiffs' right of publicity claims.[5]

Last, the Court is unpersuaded by Freedom of Expression's argument premised on the Revised Arizona Jury Instructions (the "RAJI"). (Doc 40 at 7.) The RAJI are standard jury instructions prepared by the State Bar of Arizona. RAJI (CIVIL) 6th Important Notice. The Arizona Supreme Court "decided not to issue or qualify approvals for any jury instructions." *Id.* Thus, the RAJI's use is noncompulsory. *See Pinder*, 2020 WL 6084052 at *10. Because the Court finds that Arizona recognizes the right of publicity, the Court must next address whether Plaintiffs' right of publicity claims are time-barred.

### ii.    Statute of Limitations

Freedom of Expression argues that Plaintiffs' right of publicity claims are barred by a one-year statute of limitations. (Doc. 40 at 18.) "[W]hen a defendant asserts the statute of limitations as a defense, the defendant has the burden of proving that the [claim] falls within the statute." *Troutman v. Valley Nat'l Bank of Ariz.*, 170 Ariz. 513, 517 (App. 1992). "The very purpose of enacting a statute of limitations is to fix a limit within which an action

---

[5] Freedom of Expression quotes portions of Minutes from an Arizona Senate Committee on Commerce and Economic Development meeting to suggest that the Legislature intended to eliminate the right of publicity for non-solider civilians. (Doc. 40 at 8.) Section 12-761 was proposed to ensure that deceased soldiers' families had a cause of action if the name or likeness of their loved one was used for commercial gain after his or her death. *See Pinder*, 2020 WL 6084052 at *8–9. The context of the law establishes no intent on the part of the Legislature to prevent a broader cause of action. *See Minutes of Comm. of Com. & Econ. Dev.*, 48th Leg., 1st Sess. (Ariz. 2007), available at https://azleg.gov/legtext/48leg/1R/comm_min/Senate/011007%20CED.pdf (last visited Feb. 10, 2021).

must be brought and to prevent the unexpected enforcement of stale claims against persons who have been thrown off their guard by want of prosecution." *Hall v. Romero*, 141 Ariz. 120, 126 (App. 1984). The Arizona Legislature has enacted a series of statutes setting limitations periods on common law causes of action, but the Legislature did not expressly categorize a right of publicity claim within a specific statute. Thus, the Court must determine which limitations period applies by evaluating the asserted cause of action and the potentially applicable statutes of limitations. *See Dunlap v. City of Phoenix*, 169 Ariz. 63, 66–68 (App. 1990). "The essence or gravamen of the cause of action controls [the] determination." *Id.* at 68. And when doubt exists "as to which of two limitations periods apply, courts generally apply the longer." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 182 Ariz. 586, 590 (1995).

Here, Freedom of Expression argues a one-year statute of limitations applies to Plaintiffs' right of publicity claims. (Doc. 40 at 18 (citing A.R.S. § 12-541).) Arizona law provides that a one-year statute of limitation applies to actions for "injuries done to the character or reputation of another by libel or slander." A.R.S. § 12-541(1). And, as noted, a one-year limitations period applies to claims for invasion of privacy by false light. *Watkins*, 239 Ariz. at 173. Freedom of Expression asserts that a right of publicity claim is akin to a claim for invasion of privacy by false light such that a one-year limitation period applies. (Doc. 40 at 18.) But unlike false light claims, which aim to remedy reputational harm, "the right of publicity is in the nature of a property right." *Estate of Reynolds*, 235 Ariz. at 82; *see* Restatement (Third) of Unfair Competition ("Restatement Third") § 46, cmt. d (1995) ("The right of publicity protects the commercial value of a person's identity."). Under Arizona law, property-related torts are subject to a two-year limitations period. *See* A.R.S. § 12-542; *Skinner v. Tuscan Inc.*, No. CV-18-00319-TUC-RCC, 2020 WL 5946868, at *8 (D. Ariz. Oct. 7, 2020) (declining to apply a one-year limitations period to a right of publicity claim because the claim is of the nature of a property right). Thus, the Court finds that Plaintiffs' right of publicity claims are subject to the two-year statute of limitations set forth in A.R.S. § 12-542. Because the publication dates in this matter all

occurred within two years of Plaintiffs' lawsuit, Plaintiffs' right of publicity claims are not barred by the statute of limitations.

### iii. Prima Facie Case

Under Arizona law, "'[o]ne who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability' for resulting damages." *Estate of Reynolds*, 235 Ariz. at 82 (quoting Restatement Third § 46). To be actionable, a defendant's use must "be sufficient to identify the person whose identity the defendant is alleged to have appropriated." Restatement Third § 46, cmt. d. When a defendant is alleged to have appropriated a plaintiff's visual likeness, "the plaintiff must be reasonably identifiable from the photograph or other depiction." *Id.* Violations of the right of publicity "typically arise out of the unauthorized use of a well-known person's name or likeness in connection with the advertising of goods or services." *Estate of Reynolds*, 235 Ariz. at 83. But, "the identity of even an unknown person may possess commercial value." *Id.* Moreover, "[a]lthough proof of deception or confusion is not an element of liability . . ., the right of publicity indirectly affords protection against false suggestions of endorsement or sponsorship." *Id.* at 82 (quoting Restatement Third § 46, cmt. c).

Plaintiffs argue the undisputed facts establish their right of publicity claims. (Doc. 39 at 5–6.) Specifically, Plaintiffs allege there is no material dispute that: (1) Freedom of Expression "used each Plaintiff's identity in [its] advertisements;" (2) Freedom of Expression "sought and obtained a commercial advantage by using these identities by, at minimum, getting Plaintiffs to appear for free in these advertisements;" (3) no Plaintiff has "been employed by, contracted with or has otherwise given permission or consent to [Freedom of Expression] to use her Image to advertise, promote, market or endorse Bones [Cabaret];" and (4) each Plaintiff "was injured by, at minimum, being denied the fair market revenue she would have received but for [Freedom of Expression's] misappropriations." (*Id.*) Rather than contest the merits of Plaintiffs' claims, Freedom of Expression limits its arguments to the existence of the individual right of publicity in

1    Arizona and the statute of limitations. (Doc. 40 at 7–9, 18.) Freedom of Expression

2    therefore fails to identify any material facts to support a finding that a genuine issue

3    remains. And the Court finds that the undisputed facts are sufficient for each Plaintiff to

4    establish "beyond controversy" the essential elements of her right of publicity claims. *See*

5    *S. Cal. Gas Co.*, 336 F.3d at 888.

6         The quantity of Plaintiffs' damages, however, remains a triable issue of fact.

7    Plaintiffs have sufficiently alleged that their damages are, "at minimum," the fair market

8    value of their images. (Doc. 39 at 5.) But Plaintiffs' briefing suggests that Plaintiffs may

9    seek additional damages on their right of publicity claims. Accordingly, the Court will

10   grant summary judgment in Plaintiffs' favor as to liability on the right of publicity, but the

11   measure of each Plaintiff's damages remains a question of fact for trial. *See Mitcheson*,

12   2020 WL 7075239 at *11 (granting summary judgment in the plaintiffs' favor as to liability

13   under the right of publicity in a similar case); *Skinner*, 2020 WL 5946898 at *8 (same).

14                    **2.    The Lanham Act**

15        In addition to Plaintiffs' claims under Arizona law, Plaintiffs seek relief under the

16   Lanham Act, 15 U.S.C. § 1125(a). The Lanham Act provides, in relevant part:

17            (1) Any person who, on or in connection with any goods or
18            services, or any container for goods, uses in commerce any
              word, term, name, symbol, or device, or any combination
19            thereof, or any false designation of origin, false or misleading
20            description of fact, or false or misleading representation of fact,
              which—
21

22                (A) is likely to cause confusion, or to cause mistake, or
23                to deceive as to the affiliation, connection, or
                  association of such person with another person, or as to
24                the origin, sponsorship, or approval of his or her goods,
25                services, or commercial activities by another person, or

26                (B) in commercial advertising or promotion,
27                misrepresents the nature, characteristics, qualities, or
                  geographic origin of his or her or another person's
28                goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that
he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). Thus, there are two distinct bases of liability under § 1125: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).

### a.    False Association

Both parties seek summary judgment on Plaintiffs' false association claims. The Lanham Act prohibits "the use of any symbol or device which is likely to deceive consumers as to the association, sponsorship, or approval of goods or services by another person." *Wendt*, 125 F.3d at 812. The Court considers eight factors to determine whether a likelihood of confusion exists. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). The factors, commonly referred to as the *Sleekcraft* factors, include:

> (1)  strength of the plaintiff's mark;
>
> (2)  relatedness of the goods;
>
> (3)  similarity of the marks;
>
> (4)  evidence of actual confusion;
>
> (5)  marketing channels used;
>
> (6)  likely degree of purchaser care;
>
> (7)  defendant's intent in selecting the mark;
>
> (8)  likelihood of expansion of the product lines.

*White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992). The *Sleekcraft* factors are "pliant." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). Where, as here, content is web-based, "the three most important *Sleekcraft* factors are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel." *Id.* (internal quotations omitted). Generally, whether there is a "likelihood of confusion is a factual determination and district courts should grant summary judgment motions regarding the likelihood of confusion sparingly." *Fortune Dynamic, Inc.*, 618 F.3d at 1039 (internal quotations omitted).

1    Summary judgment should not be granted "in cases in which a majority of the *Sleekcraft*
2    factors could tip in either direction." *Id.*

3                    **i.      Strength of Plaintiffs' Marks**

4          There is a genuine issue of material fact as to the strength of each Plaintiff's mark.
5    In cases involving alleged celebrities, "'mark' means the celebrity's persona." *White*, 971
6    F.2d at 1400. The "strength" of a plaintiff's "mark refers to the level of recognition that the
7    celebrity has among the segment of the public to whom the advertisement is directed."
8    *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007 (9th Cir. 2001). Plaintiffs have
9    provided evidence of social media followings ranging from 16 thousand to 2 million
10   followers. (Doc. 39–4 at 2, 24.) And Plaintiffs' expert, Mr. Buncher, reported that 14% to
11   19% of a random sample of adults in the Phoenix-metropolitan area who had patronized
12   strip clubs or bikini bars within the past two years recognized each Plaintiff. (Doc. 44 at 11;
13   Doc. 46–5 at 8, 20.) Freedom of Expression submitted no counter-survey. Rather, Freedom
14   of Expression points to evidence suggesting that Plaintiffs engaged in "sporadic modeling
15   and appearance roles" such that their personas are not sufficiently recognizable to give rise
16   to false association claims. (Doc. 40 at 12–14.) Moreover, and as noted, Freedom of
17   Expression has raised several objections to Plaintiffs' survey evidence for the trier of fact
18   to consider when weighing the survey's probative value. *See supra* Part III.A.1.a. The
19   factfinder could reasonably conclude that, given their social media followings and
20   recognition rates, Plaintiffs are sufficiently well known to claim false association. But it is
21   also true that the factfinder could discount Plaintiffs' survey evidence and reasonably
22   conclude that Plaintiffs' personas are too obscure to give rise to a claim. Thus, this factor
23   could tip in favor of either side.

24                   **ii.     Relatedness of the Goods**

25         Both parties contend the "relatedness of the goods factor" falls in their favor.
26   Plaintiffs argue that both parties seek to "attract customers and/or clientele by and through
27   the use of the image of a beautiful woman." (Doc. 39 at 13.) Thus, Plaintiffs say, this factor
28   weighs strongly in their favor. (*Id.*) Freedom of Expression, on the other hand, asserts that

Plaintiffs have admitted "their fame is patently unrelated to [Bones Cabaret's] goods." (Doc. 52 at 5.) Freedom of Expression thereby contends the factor weighs in its favor. (*Id.*)

In cases involving an alleged celebrity, a "plaintiff's 'goods' concern the reasons for or source of the plaintiff's fame." *White*, 917 F.2d at 1400 (explaining that, "[b]ecause [Vanna] White's fame is based on her televised performances, her 'goods' are closely related to [the defendant's] VCRs"). The relevant question is "whether a consumer would be confused as to [Plaintiffs'] association with or sponsorship of [Bones Cabaret]." *Wendt*, 125 F.3d at 813. Although the parties disagree as to the precise nature of the goods at issue, Freedom of Expression's advertising and "at least a portion of [] Plaintiffs' modeling work demonstrate that both parties market female sexuality." *Mitcheson*, 2020 WL 7075239 at *13. Plaintiffs' survey evidence indicates that 83% of survey respondents believed Plaintiffs "agreed to sponsor, endorse or promote [Bones Cabaret]." (Doc. 46–5 at 22.) Thus, a reasonable trier of fact could conclude that Freedom of Expression's use of each Plaintiff's image is closely related to her fame. That said, and as noted, the factfinder will have the opportunity consider Freedom of Expression's objections to Mr. Buncher's survey when weighing the probative value of the evidence. Accordingly, there is a triable issue as to the relatedness of the parties' goods.

### iii.    Similarity of the Marks

In celebrity cases, the Court considers "the similarity of the likeness used by the defendant to the actual plaintiff." *Downing*, 265 F.3d at 1008. Freedom of Expression concedes that "this factor weighs in favor of Plaintiffs because the subject photographs are unaltered photographs of the Plaintiffs." (Doc. 52 at 5.) *See Downing*, 265 F.3d at 1008 ("[T]he similarity of the likeness . . . is clear because it is an actual photograph of the Appellants with their names designated.").

### iv.    Evidence of Actual Confusion

"[S]urvey evidence may establish actual confusion." *Fortune Dynamic, Inc.*, 618 F.3d at 1035. Plaintiffs' survey evidence indicates that 83% of respondents thought Plaintiffs "agreed to sponsor, endorse or promote [Bones Cabaret]," 87% of respondents

thought Plaintiffs "approve[d] the use of their image in those Club advertisements in which they appear," and 68% of respondents thought Plaintiffs "participate in the events or activities which take place in the Club." (Doc. 46–5 at 22–23.) *See Warner Bros. Ent. v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG, 2012 WL 6951315, at *10 (C.D. Cal. Dec. 10, 2012) ("Generally, confusion levels of 25 to 50 percent provide 'solid support' for a finding of likelihood of confusion, while confusion rates below 20 percent support a finding of confusion only in connection with other corroborating evidence."). Plaintiffs' survey evidence contradicts Freedom of Expression's contention that "Plaintiffs have not provided a single piece of evidence establishing actual confusion amongst consumers." (Doc. 52 at 6.) But Freedom of Expression may undermine the weight the trier of fact affords to the survey evidence through questioning the survey's methods during cross-examination. Thus, there is a triable issue as to actual confusion.

### v.     Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) (quoting *Sleekcraft*, 599 F.2d at 353). But "the shared use of a ubiquitous marketing channel," like the Internet, "does not shed much light on the likelihood of consumer confusion." *Id.*; *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) (concluding a plaintiff and defendant's use of the Internet as a marketing channel rendered the factor "equivocal"). In this case, both parties used social media platforms to market their products. Although this marketing channel is narrower than all Internet-based marketing, social media is nonetheless a broadly used form of promotion. *See Mitcheson*, 2020 WL 7075239 at *14. Thus, this factor sheds little light on the Court's overall analysis but weighs slightly in favor of Plaintiffs. *Id.*

### vi.     Likely Degree of Purchaser Care

"Low consumer care . . . increases the likelihood of confusion." *Playboy Enters., Inc.*, 354 F.3d at 1028. The degree of care analysis requires the Court to consider the nature and cost of the goods at issue. *Network Automation, Inc.*, 638 F.3d at 1152. When "goods

are expensive, [a] buyer can be expected to exercise greater care." *Id.* "Consumer care for inexpensive products," on the other hand, "is expected to be quite low." *Playboy Enters., Inc.*, 354 F.3d at 1028. Plaintiffs contend reasonable consumers exercise a low degree of care when choosing between strip clubs because patronizing "a strip club is not a particularly expensive endeavor." (Doc. 44 at 13.) Freedom of Expression argues that consumers who visit strip clubs are generally "sophisticated" and "selective." (Doc. 40 at 15.) Neither party offers evidence to support their assertions. Given the parties' conflicting positions and the lack of other evidence, the trier of fact must determine the likely degree of purchaser care in this case. *See Fortune Dynamic, Inc.*, 618 F.3d at 1038 ("[T]he difficulty of trying to determine with any degree of confidence the level of sophistication of young women shopping at Victoria's Secret only confirms the need for this case to be heard by a jury.").

### vii.   Freedom of Expression's Intent

When considering a defendant's intent, the relevant question is whether the defendant "intended to profit by confusing consumers concerning the endorsement of [the defendant's goods]." *White*, 971 F.2d at 1400 (internal quotations omitted). If "an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993). Plaintiffs assert that Freedom of Expression's intent in using their images in Bones Cabaret's advertising "was to confuse consumers concerning the employment of [Plaintiffs]." (Doc. 39 at 15.) Freedom of Expression denies this allegation. Instead, Freedom of Expression contends it "did not choose the Plaintiffs for any reason in particular (like fame or notoriety)." (Doc. 40 at 15.) Because "[i]ssues of credibility, including questions of intent, should be left to the jury," a triable issue exists as to Freedom of Expression's intent. *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999).

### viii.   Likelihood of Expansion of the Product Lines

"[A] strong possibility that either party may expand [its] business to compete with the other" increases the likelihood of confusion. *Network Automation, Inc.*, 638 F.3d at

1153. Plaintiffs are models. Freedom of Expression operates a strip club. Plaintiffs have offered no evidence that they intend to enter Freedom of Expression's line of business. Thus, as is true in most false association claims involving alleged celebrities, this factor is inapposite. *White*, 971 F.2d at 1401.

### ix.   Conclusion

Whether there is a "likelihood of confusion is a factual determination and district courts should grant summary judgment motions regarding the likelihood of confusion sparingly." *Fortune Dynamic, Inc.*, 618 F.3d at 1039 (internal quotations omitted). In this case, there are disputes of material fact as to the strength of Plaintiffs' marks, the relatedness of the goods, evidence of actual confusion, the likely degree of purchaser care, and Freedom of Expression's intent. Thus, neither Plaintiffs nor Freedom of Expression are entitled to summary judgment on Plaintiffs' false association claims. *Id.*

### b.   False Advertising

As a threshold matter, Freedom of Expression argues Plaintiffs did not plead or disclose their false advertising claims. (Doc. 47 at 8.) The Court disagrees. Count II of Plaintiffs' Complaint alleges "Violation of the Lanham Act, 15 U.S.C. § 1125(a)," which encompasses both false association and false advertising. (Compl. at 16.) The Complaint expressly references 15 U.S.C. § 1125(a)(1)(B), the subsection germane to false advertising, and states that Freedom of Expression's "unauthorized use and alteration of [Plaintiffs'] images, likenesses, and/or identities as described in this Complaint constitutes false advertising." (*Id.* ¶¶ 59, 62.) The factual allegations in Count II correspond to both subsections of § 1125(a). (*Id.* ¶¶ 58–76.) Plaintiffs' Complaint thereby gives Freedom of Expression fair notice of Plaintiffs' false advertisement claims and the grounds upon which the claims rest. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Accordingly, the Court rejects Freedom of Expression's argument that Plaintiffs have not pleaded or disclosed their false advertisement claims.

Freedom of Expression, in the alternative, and Plaintiffs both contend they are entitled to summary judgment on Plaintiffs' false advertising claims. Only Freedom of

1   Expression is correct. To invoke the Lanham's Act cause of action for false advertising, a

2   plaintiff must establish that (1) her alleged injury falls within the "zone of interests"

3   protected by the Lanham Act, and (2) her injury was proximately caused by a violation of

4   the Act. *Lexmark Int'l, Inc.*, 572 U.S. at 129–34. The Court will address each requirement.

5                          **i.      Zone of Interests**

6           To come within the Lanham Act's zone of interests a plaintiff "must allege an injury

7   to a commercial interest in reputation or sales." *Lexmark Int'l, Inc.*, 572 U.S. at 131–32. A

8   false advertising claim implicates the Lanham Act's goal of "protect[ing] persons engaged

9   in [commerce within the control of Congress] against unfair competition." 15 U.S.C.

10  § 1127. But it is "a mistake to infer that because the Lanham Act treats false advertising as

11  a form of unfair competition, [the Act] can protect *only* [a] false-advertiser's direct

12  competitors." *Lexmark Int'l, Inc.*, 572 U.S. at 136 (rejecting a direct-competitor test, which

13  permitted Lanham Act suits only by an actual competitor). Indeed, any "rule categorically

14  prohibiting all suits by noncompetitors would read too much into the Act's reference to

15  'unfair competition' in § 1127." *Id.* Thus, there is tension between *Lexmark* and the Ninth

16  Circuit's prior opinions requiring a plaintiff to establish that an "injury is 'competitive,' or

17  harmful to the plaintiff's ability to compete with [a] defendant." *Jack Russell Terrier*

18  *Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005). The

19  analyses, however, are not irreconcilable. In *Lexmark*, the Supreme Court determined that

20  a respondent's alleged injuries were "precisely the sorts of commercial interests the Act

21  protects" because the respondent's "position in the marketplace ha[d] been damaged by

22  [the petitioner's] false advertising." 572 U.S. at 137. Thus, although a plaintiff asserting a

23  false advertising claim need not be in direct competition with a defendant, the plaintiff

24  must allege harm "related to the plaintiff's success in the market, not just between the

25  parties."[6] *Mitcheson*, 2020 WL 7075239 at \*16; *see also Lexmark Int'l, Inc.*, 572 U.S. at

26  ─────────────────

27  [6] The Ninth Circuit has not yet articulated whether a plaintiff must still show that she or he
    is in commercial competition with a defendant post-*Lexmark*. *See Ariix, LLC v.*
    *NutriSearch Corp.*, --- F.3d ----, 2021 WL 221878, at \*9 (9th Cir. Jan. 22, 2021) (assuming
    without deciding that a plaintiff need not satisfy the commercial competition element of a
28  false advertising claim under the Lanham Act). Courts within the Ninth Circuit that have
    applied *Lexmark* affirm the "understanding that false advertising must allege a harm related

133 ("[C]ommercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising.").

Here, Plaintiffs allege that they "suffered an injury to their commercial interests in sales by not getting paid for [Freedom of Expression's] use of their image." (Doc. 51 at 7.) Plaintiffs are simply claiming that they are entitled to compensation for Freedom of Expression's alleged misrepresentations. Plaintiffs offer no common marketplace in which consumer dollars were diverted from Plaintiffs because of Freedom of Expression's false claims. Plaintiffs do not offer any evidence that their position in the market has been damaged by Freedom of Expression's alleged misrepresentations. *See Lexmark Int'l, Inc.*, 572 U.S. at 137. And Plaintiffs provide no facts suggesting that Freedom of Expression's "deception of consumers cause[d] [the consumers] to withhold trade from" Plaintiffs. *Id.* at 133. Thus, although Freedom of Expression may well have injured Plaintiffs, Plaintiffs' alleged injuries are not within the zone of interests that the Lanham Act protects.

### ii.    Proximate Cause

Even if Plaintiffs' alleged injuries did implicate the Lanham Act's zone of interests, Plaintiffs have not established a triable issue on proximate cause. A plaintiff alleging a false advertising claim "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark Int'l, Inc.*, 572 U.S. at 133. The relevant question is "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.*

In this case, the harm alleged is that Plaintiffs did not get paid for Freedom of Expression's use of their images. (Doc. 39 at 10–11.) The alleged deception is that, contrary to Freedom of Expression's advertisements, Plaintiffs are not affiliated with Freedom of Expression and consumers will not find Plaintiffs working at Bones Cabaret. (*Id.* at 8–9.) Plaintiffs do not offer any facts suggesting that Freedom of Expression's allegedly false advertising caused consumers to withhold trade from Plaintiffs. *See Lexmark Int'l, Inc.*, 572 U.S. at 133. Nor do Plaintiffs argue that their injuries are derivative

---

to the plaintiff's success in the market, not just between the parties." *Mitcheson*, 2020 WL 7075239 at *16.

of any harm suffered by consumers deceived by Freedom of Expression's advertisements. *Id.* Instead, the facts indicate that Freedom of Expression's failure to negotiate with and pay Plaintiffs caused Plaintiffs' alleged injuries. Plaintiffs "cannot obtain relief without *evidence* of injury proximately caused by [Freedom of Expression's] alleged misrepresentations." *Id.* at 140 (emphasis in original). Accordingly, Freedom of Expression is entitled to summary judgment on Plaintiffs' false advertising claims.

### 3.   Collateral Estoppel

Last, Freedom of Expression argues Ms. Young is collaterally estopped from litigating her Lanham Act claims, and Ms. Pinder is precluded from litigating her claims arising under Arizona law. (Doc. 40 at 19–21.) "Collateral estoppel, or issue preclusion, bars the relitigation of issues actually adjudicated in previous litigation between the same parties." *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992). "Defensive collateral estoppel applies 'when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." *Masson v. New Yorker Mag.*, 85 F.3d 1394, 1400 (9th Cir. 1996) (internal quotations omitted). Freedom of Expression "bears the burden of showing with clarity and certainty what was determined by the prior judgment." *Clark*, 966 F.2d at 1321. "It is not enough that the party introduce the decision of the prior court; rather, the party must introduce a sufficient record of the prior proceeding to enable the trial court to pinpoint the exact issues previously litigated." *Id.* (internal quotations omitted).

Here, Freedom of Expression argues Ms. Young's Lanham Act claims are precluded because two cases in the Southern District of New York resolved similar issues as those presented in this matter. (Doc. 40 at 20.) Freedom of Expression goes no further than asserting, in conclusory fashion, that "Ms. Young litigated an identical false endorsement claim" in *Toth v. 59 Murray Enterprises, Inc.*, No. 15 Civ. 8028, 2019 WL 95564 (S.D.N.Y. Jan. 3, 2019), and notes that the court, in *Toth*, dismissed the claim "for the very same arguments" Freedom of Expression makes in this case. (*Id.*) Similarly, Freedom of Expression contends Ms. Pinder is precluded from relitigating her claims arising under

Arizona law because the Maricopa County Superior Court already resolved similar claims. (*Id.* at 21.) To bolster its position, Freedom of Expression merely states that the Superior Court dismissed Ms. Pinder's state law claims "for the same arguments made above." (*Id.*) Freedom of Expression "makes no showing that the factual circumstances in the cases are the same and warrant the application of collateral estoppel." *Mitcheson*, 2020 WL 7075239 at *17. Thus, Freedom of Expression's bare assertions do not possess the "clarity" and "certainty" needed for collateral estoppel to apply.

## IV.    CONCLUSION

To summarize, the Court finds that the issue of damages under Plaintiffs' right of publicity claims and Plaintiffs' false association claims under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), will proceed to trial. At trial, each expert will be permitted to testify to their expert opinions.

Accordingly,

**IT IS ORDERED denying** Plaintiffs' Motion to Strike the Expert Report and Testimony of Michael Einhorn (Doc. 37); Defendant's Motion to Strike the Report and Testimony of Stephen Chamberlin (Doc. 45); and Defendant's Motion to Strike the Report and Testimony of Martin Buncher (Doc. 46).

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 39) is **granted in part** and **denied in part**. Plaintiffs' Motion for Summary Judgment is **granted** in favor of Plaintiffs as to the issue of liability on Plaintiffs' right of publicity claims. Plaintiffs' Motion for Summary Judgment is **denied** as to all other claims.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 40) is **granted in part** and **denied in part**. Defendant's Motion for Summary Judgment is **granted** in favor of Defendant as to Plaintiffs' claims for invasion of privacy by false light and as to Plaintiffs' claims for false advertising under the Lanham Act. Defendant's Motion for Summary Judgment is **denied** as to all other claims.

**IT IS FINALLY ORDERED** setting a trial-setting conference for Thursday, February 25, 2021, at 10:00 A.M., in Courtroom 503, Sandra Day O'Connor U.S. Federal

Courthouse, 401 W. Washington St., Phoenix, Arizona 85003-2151. Participants shall have their calendars available and be prepared to schedule dates for a Final Pretrial Conference and for trial. In-person appearance is preferred; however, the Court will permit telephonic appearance upon request.

Dated this 10th day of February, 2021.

Michael T. Liburdi
United States District Judge